345 So.2d 1004 (1977)
James W. WALLACE et ux., Plaintiffs-Appellants,
v.
STATE FARM FIRE & CASUALTY INSURANCE COMPANY, Defendant-Appellee.
No. 13212.
Court of Appeal of Louisiana, Second Circuit.
April 25, 1977.
Rehearing Denied May 23, 1977.
*1005 Charles W. Robinson, West Monroe, for plaintiffs-appellants.
Hudson, Potts & Bernstein by Jesse D. McDonald, Monroe, for defendant-appellee.
Before BOLIN, HALL and JONES, JJ.
JONES, Judge.
Plaintiffs, James W. Wallace and Billie Alderman Wallace, brought suit against State Farm Fire and Casualty Insurance Company for payment under the terms of a homeowner's insurance policy for destruction of their house and furnishings by fire, and for penalties and attorney's fees based upon State Farm's arbitrary and capricious refusal to pay the claim after proper notice. State Farm denied liability, claiming the fire was caused by arson for which plaintiffs were responsible, and reconvened for those amounts which it had paid to the mortgagees of the house, and for which it had been subrogated. From a trial court judgment upholding State Farm's defense of arson, and awarding State Farm those amounts for which it had reconvened, plaintiffs appeal. We reverse.
James Wallace, a self-employed contractor, was judicially separated from his wife, Billie Alderman Wallace. When they separated, Billie and the children moved into a home owned by her brother some seven or eight blocks from the former marital domicile. Although James' employment was in New Orleans he returned to West Monroe almost every weekend and stayed in the former marital domicile, entertaining the children and visiting with his wife.
James was staying in the house on the weekend of October 21, 1975. He had his son clean the yard and arranged to have it mowed on Saturday. He spent most of the day Sunday with his son and daughter, and a neighbor's child, vacuuming and cleaning, washing dishes and generally straightening the house. James left the house about 6:30 p.m. that night with his son, taking him to church, and then went to his wife's residence for supper. He left his wife's house about 8:00 p.m. to travel to New Orleans, where he was working. He stopped in Baton Rouge about 11:00 p.m. to visit a friend for several hours, as he did every few months, and continued on to New Orleans, where he stayed with his brother.
At 1:30 a.m. that morning James' house was discovered ablaze by neighbors. The fire department responded quickly but was only able to prevent approximately one-half of the house from burning to the ground.
James was contacted by his wife later that day but was unable to return to West Monroe until the morning of October 23. James' wife, Billie, contacted their insurer, State Farm, regarding the fire. An adjuster, Paul Farmer, met with her and viewed the remains of the house. When James arrived, he also met with Farmer. Both Wallaces cooperated with Farmer, giving him all information he requested. Over the next month, both of the Wallaces met with Farmer several times in connection with submitting a proof of loss to State Farm. The formal proof of loss was submitted on November 27, 1975.
After Farmer first viewed the house, he contacted a deputy state fire marshal and asked him to inspect the site. After so doing the fire marshal told Farmer he felt the fire was caused by arson.
In early January, State Farm informed plaintiffs it would not pay the value of the *1006 policy because the fire was the result of arson and it believed James Wallace was responsible for the fire. When State Farm had not paid the claim within 60 days of the submission of the formal proof of claim plaintiffs filed this suit. Subsequent to this, State Farm paid the two mortgagees of the house named in the policy, and against whom the policy provided no defense of arson. Upon being subrogated to these amounts, State Farm reconvened against the plaintiffs.
On appeal, plaintiffs assert the trial court erred both in finding the fire was caused by arson and in finding James Wallace responsible for it.
At trial, State Farm qualified a deputy state fire marshal and an independent investigator as experts on arson, who testified as to the causes of fires. Both stated they were of the opinion this fire was caused by arson. While they found no direct evidence of accelerants (e. g., gasoline, fuel oil, kerosene, etc.), they stated the manner that the house burned, and an examination of the debris indicated the use of accelerants. These included evidence of a "splash pattern" and the intensity of the fire. They explained a "splash pattern" is formed by the use of accelerants and is evidenced by a fairly clear demarcation in the effect of the fire on the structure, and is also evidenced by several small areas, detached from the main blaze, evidencing signs of a more intense flame for no obvious reason. They also pointed out the way the fire burned straight through the roof instead of spreading out when it reached the attic evidenced an intense heat. They stated the width and depth of the cracks in the large timbers ("alligatoring") here also evidenced an intense heat, as did the fact that several metal articles were pitted or melted. They emphasized such intense heat was caused by the use of accelerants.
These experts also testified the only ignition sources present in the area of the fire were a television set, electrical connections and a gas space heater. They stated an inspection of the inside of the television and its location with reference to the area of origin of the fire indicated it was not the source of the fire. The independent investigator testified he examined the debris and could find no evidence of fused wire which would indicate any other electrical fixture caused the fire. Both experts testified they examined the space heater after the fire and it had no indication of leaking or other defect.
Laboratory tests made by defendant's experts on the ashes found no evidence of accelerants, although defendant's experts stated this was expected since the samples were not taken until several months after the fire. The evidence also did not show any of several other indications of arson such as fire breaking out at several points at once, or remains of incendiary materials placed in the house, or visual evidence of accelerants in the water surrounding the house after the blaze, nor did any of plaintiffs' neighbors or the firemen notice any odor of accelerants at the fire. See Wells v. Twin City Fire Insurance Company, 239 La. 662, 119 So.2d 501 (1960).
While plaintiffs offered the testimony of two experienced firemen who stated they did not feel this fire was caused by arson, and otherwise disagreed with portions of the testimony given by defendant's experts, the trial judge felt the evidence and testimony was sufficient to establish that the fire was of incendiary origin (i. e., arson). When such a conflict is presented by the testimony at trial, the determination of the trial judge is accorded great weight and will not be modified in the absence of manifest error. While we might not have reached the same conclusion from this evidence as did the trial judge, we cannot hold the trial judge committed manifest error and therefore his finding in this respect will not be disturbed.
Plaintiffs also assert the trial court erred in finding defendants proved Wallace had sufficient motivation to commit arson, was the only person with such a motive, and was therefore presumed to have been responsible for this fire.
To sustain the defense of arson, the insurer has the burden of proving by a *1007 preponderance of the evidence that (1) the fire was of incendiary origin, and (2) plaintiff was responsible for it. Proof may be, and invariably is, by circumstantial evidence. When proof is circumstantial, the evidence must be so convincing that it will sustain no other reasonable hypothesis but that plaintiff was responsible for the fire. Sumrall v. Providence Washington Insurance Company, 221 La. 633, 60 So.2d 68 (1952); Baghramain v. MFA Mutual Insurance Company, 315 So.2d 849 (La.App., 3d Cir. 1975); Artigue v. Louisiana Farm Bureau Mutual Insurance Company, 339 So.2d 880 (La.App., 3d Cir. 1976).
Defendants contended the following circumstances establish that Wallace had sufficient motivation to commit arson:
1. The insured had a substantially decreased need for the premises; (2) the house was overinsured; (3) the insured was in dire financial circumstances.
State Farm asserts plaintiffs had a substantially decreased need for the house because of their separation. This is unsupported by the evidence. Wallace lived in the house almost every weekend, driving up from New Orleans to visit his children and his wife. That Wallace considered his home an important part of his life style is shown by his continuing maintenance of the house and yard. Even the trial court stated it was not impressed with this argument.
State Farm also asserts the house was substantially overinsured, which presents an additional motive. The trial court recognized the house was currently worth $13,000 to $14,000, but was insured for $21,981. However, it is significant this policy was purchased over four years prior to the fire at a face amount of $15,000. All additional coverage was provided by an inflationary coverage endorsement, which was indexed to the composite construction cost index published by the U.S. Department of Commerce. The trial court very clearly recognized there was no evidence the insured was actually aware of this increased coverage, but found there was a legal presumption of such knowledge.
While we agree Wallace may be presumed to know the value of the policy on his home, we do not feel the fiction of presumption should be used to establish an insured's motivation to commit arson. Therefore, we do not feel this presumption extends to impute to him knowledge that the house was overinsured. When the initial face value of the policy is reasonably within the value of the house at the time it is insured, we do not see how the insurer can validly complain of overinsurance when they sell the insured a policy endorsement having as its only purpose to increase the value of the policy by an amount sufficient to keep the house from becoming underinsured. This would seem to be especially true in light of public policy as evidenced by the "valued policy" law, LSA-R.S. 22:695.
A careful study of the trial court's reasons for judgment indicates it principally relied upon a finding that the insured was in dire financial trouble, and this gave him a motive to commit arson. After a thorough examination of the evidence as to the financial condition of Wallace, we hold the trial court was in error in finding James Wallace was in such dire financial condition as to give him such a motive.
A financial statement was introduced into evidence which reflected Wallace had a net worth of some $16,000. A review of this statement indicates the assets listed may be slightly overvalued, but no more than by $2,000. Of the listed debts, only $3,700 was secured by mortgages on his home.
The holder of the first mortgage, First Federal Savings and Loan, was owed a balance of $2,424.50, payable in monthly installments of $44.35, and contrary to the trial judge's findings, was current on the date of the fire.
The holder of the second mortgage, American Acceptance Associates, was owed a balance of $1,287.57, payable in monthly installments of $183.08, and at the time of the fire was two months past due. However, it was brought out at trial that Wallace was regularly behind in his payments, *1008 and had in fact been two months behind on this account some 14 separate occasions. The manager of this company testified he had no intention of commencing legal action because of this arrearage.
The only other obligation which was two months delinquent was $1,173.64, owed to Pico Finance payable at $90.28 per month. This debt was secured by a chattel mortgage on furniture, and while there was evidence Pico was contemplating legal proceedings, there is no evidence it had conveyed this information to Wallace.
State Farm also claimed James Wallace had two judgments against him. One of these, of which James denied knowledge, is a judgment of seizure and sale creating no personal liability on James, and relating to an automobile purchased by James' son-in-law, upon which James was an accommodation endorser on the loan. The other was a judgment of $506 taken 20 months prior to the fire. Testimony at trial established $300 had been paid on this judgment, and no further efforts had been taken to collect on it.
The evidence reflects Wallace had no "regular" job but did small contract type repair work which resulted in his having a spasmodic income. His creditors were all aware of this and over the years all of them had accepted his payment on obligations in a spasmodic manner. The various loan company managers with whom he dealt indicated Wallace did not seem to become disturbed by his mere delinquency in payment of debts. They all testified that although he was not punctual paying his debts, he always paid them off eventually.
While it was true Wallace apparently earned only $8,000 the year preceding the fire, he inherited $7,000 during that year, and won a Cadillac automobile which he sold for $7,500. Under these two circumstances his failure to sufficiently dedicate himself to his business to earn a larger sum is understandable. Certainly when considering the totality of the facts, there is no reason to believe Wallace would not earn a greater sum the following year. When all these circumstances are known, the insured cannot be considered in such dire financial condition as to motivate him to commit arson merely because of the date of the fire he had only $100 cash in his pocket and had monthly obligations of approximately $500.
The law requires the insurer to prove the insured was responsible for the fire in order to rely on a defense of arson. There is no direct evidence in the record to establish this fact. The insured's home was located in an area in west Ouachita Parish where many low income people reside. There was evidence of vandalism in one school and one home not far from insured's residence. There was evidence that a stranger had entered the home of his next door neighbor through a window. All of these incidences occurred at a time not far distant from the burning of plaintiff's residence. Near plaintiff's home is a levee across which is located a wooded area habitually used by people for camping and camp fire burning. While there is no evidence any vandal in the area was guilty of setting the fire, certainly this is not an unreasonable possibility considering the location of plaintiff's home, especially in light of testimony that the house was often unlocked because it was used by Wallace's children in his absence.
We hold the trial judge's finding that James Wallace was in the house alone for 15-20 minutes on the night of the fire, before going to eat supper with his wife, was erroneous. James denied he was alone in the house and the record contains no evidence which contradicts him.
We do not feel State Farm has shown the dire financial condition or other motivation required for us to say it is more probable than not Wallace was responsible for the destruction of his home, thereby attempting to defraud State Farm and committing the crime of arson. The judgment of the trial court must be reversed.
It is stipulated the value of the policy is $21,981 and the house is obviously a total loss, since the cost of repair was approximately the amount of the policy. Plaintiffs have also shown losses to moveables contained in the house in an amount of *1009 $5,146.82, and temporary living expenses of $490. The policy in the record provides plaintiffs are entitled to recovery of these amounts, less a $100 deductible on the damage to the house. State Farm is entitled to a credit of $3,712.10, which it paid to American Acceptance Corporation and First Federal Savings and Loan as mortgagees, as of the date of this payment.
Plaintiffs also ask for penalties and attorney's fees under LSA-R.S. 22:658, for State Farm's arbitrary and capricious refusal to remit the proceeds of the policy within 60 days after proof of loss was submitted. Considering the findings of arson and the prima facie financial trouble of James Wallace, we do not think State Farm's refusal to pay was arbitrary and capricious. Hope v. South Texas Lloyds, 171 So.2d 837 (La. App., 2d Cir. 1965).
With regards to plaintiff's request that we set expert witness fees in this matter, we set the fee of Dr. Frank J. Bruscato in the amount of $150, and the fee of Bobby G. Foley in the amount of $75, to be taxed as costs. We reject plaintiffs' request for expert witness fees for those witnesses who were not qualified by the trial court as experts.
For the foregoing reasons the judgment of the trial court is reversed, and judgment is rendered in favor of James W. Wallace and Billie Alderman Wallace, and against State Farm Fire and Casualty Insurance Company in the amount of Twenty Seven Thousand Five Hundred Seventeen and 82/100 ($27,517.82) Dollars with 7% interest from judicial demand until paid, less a credit of Three Thousand Seven Hundred Twelve and 10/100 ($3,712.10) Dollars as of February 25, 1975. State Farm Fire and Casualty Insurance Company is assessed with costs, below and on this appeal, including the expert fees mentioned above.
Reversed and rendered.