**CAPPAERT ENTERPRISES, a Mississippi Partnership**

v.

**CITIZENS AND SOUTHERN INTERNATIONAL BANK OF NEW ORLEANS.**

**Civ. A. No. 78-3635.**

United States District Court, E.D. Louisiana.

May 12, 1983.

Robert B. Bieck, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendant.

Lee Davis Thames, Ramsey, Bodron, Thames & Robinson, Vicksburg, Miss., for plaintiff.

## MEMORANDUM AND ORDER

MENTZ, District Judge.

Two motions are now before the Court in this case. Argument on both was heard on September 18, 1982. The first motion was submitted by Citizens and Southern International Bank of New Orleans ("C & S"), pursuant to Rule 65.1 of the Federal Rules of Civil Procedure.[1] C & S' motion requests the Court to assess damages against Cappaert Enterprises ("Cappaert") and Cappaert's surety, American Employers Insurance Company ("AEIC"), for wrongful issuance of a temporary restraining order, a preliminary injunction, and an injunction pending appeal. The second motion, which is really a response to the first, was submitted by Cappaert. Cappaert's motion requests the Court to dissolve the bond Cappaert had to post pending appeal of the Court's refusal to grant a permanent injunction. Following argument on both motions, the Court ordered counsel to submit additional memoranda. On December 8, 1982, the Court held an evidentiary hearing on the damages issue. Both motions were then formally taken under submission on January 24, 1983.

A brief review of the facts is essential to understanding the dispute here. On November 6, 1978, this Court, the late Judge Gordon presiding, issued a temporary restraining order prohibiting C & S from making any payments on a letter of credit that C & S had established, at the request of Cappaert, in favor of the Bank of Kuwait and the Middle East. Ten days later, the Court converted the temporary restraining order into a preliminary injunction. In issuing both the order and the injunction, the Court did not require Cappaert to post a bond. The Court explained this decision by saying that, since Cappaert had already furnished C & S with adequate security, a bond would only produce "economic waste." This decision was clearly consistent with F.R.Civ.P. 65(c), which states that a court need only require an applicant for provisional injunctive relief to provide adequate "security."[2] *Monroe Division, Litton Business Systems, Inc. v. De Bari,* 562 F.2d 30 (10th Cir.1977). Nothing in the Rule says that the security furnished must be a bond.

The preliminary injunction remained in effect until April 3, 1980. On that day, the Court dissolved the preliminary injunction and denied Cappaert's request for a permanent injunction. Immediately thereafter, Cappaert petitioned this Court for a new injunction pending appeal of the judgment. At a hearing on the petition, C & S informed the Court that the security Capp-

---

1. F.R.Civ.P. 65.1 reads, in relevant part:
 Whenever these rules . . . require or permit the giving of security by a party, and security is given in the form of a bond or stipulation or other undertaking with one or more sureties, each surety submits himself to the jurisdiction of the court and irrevocably appoints the clerk of the court as his agent upon whom any papers affecting his liability on the bond or undertaking may be served. His liability may be enforced on motion without the necessity of an independent action.

2. The relevant language in Rule 65(c) reads:

 No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.
 C & S' security consisted of a $500,000.00 certificate of deposit in Cappaert's name pledged to C & S, together with a $300,000.00 letter of credit issued to C & S by the Bank of Vicksburg at Cappaert's request.

aert had originally furnished would not be sufficient to protect C & S against damages the bank might sustain during pendency of the appeal. To ensure that C & S would be adequately protected, the Court agreed to issue another injunction but only on the condition that Cappaert post a bond.[3] Without objection, Cappaert posted a $300,-000.00 surety bond designating AEIC as surety. On October 14, 1981, the Fifth Circuit affirmed the denial of Cappaert's request for a permanent injunction. Since then, the parties by joint motion have reduced the bond to $100,000.00.

The specific damages C & S now claims are these:

| | | |
|---|---|---|
| (1) | Legal fees— | $ 33,244.20 |
| (2) | Opening Fee— | 22,428.95 |
| (3) | Expert Witness Fee— | 16,236.25 |
| (4) | Paying Commission— | 679.67 |
| (5) | Telex Charges— | 415.00 |
| (6) | Amendment Fee— | 15.00 |
| | TOTAL | $ 73,019.07 |

In Cappaert's view, C & S has failed to prove that the bank suffered any damages as a result of the injunctive relief the Court granted Cappaert.

 According to the Federal Rules of Civil Procedure, if an applicant for provisional injunctive relief furnishes security and the court grants the relief, the enjoined party cannot recover damages caused by the relief unless the enjoined party can show, among other things, that it has been "wrongfully enjoined or restrained."[4] F.R. Civ.P. 65(c). What this means, exactly, is not altogether clear. A careful review of authorities reveals that at least two different standards exist for applying the rule. The first can be found in *Page Communications Engineers, Inc. v. Froehlke,* 475 F.2d

994 (D.C.Cir.1973). There the D.C.Circuit stated, at 997:

Although Rule 65(c) required a bond here, it does not follow that the District Court was bound to award damages on the bond, without considering the equities of the case. The Rule did not make judgment on the bond automatic, upon a showing of damage. On the contrary, the court in considering the matter of damages was exercising its equity powers, and was bound to effect justice between the parties, avoiding any result that would be inequitable or oppressive for either party. The Rule was not intended to negate the court's duty in this regard. Thus, we hold that the court had discretion to refuse to award damages, in the interest of equity and justice.

*See also H & R Block, Inc. v. McCaslin,* 541 F.2d 1098 (5th Cir.1976); *Greenwood County v. Duke Power Company,* 107 F.2d 484 (4th Cir.1939), *cert. denied,* 309 U.S. 667, 60 S.Ct. 608, 84 L.Ed. 1014 (1940). This is the "judicial discretion" standard. The second standard can be found in *Atomic Oil Co. of Oklahoma, Inc. v. Bardahl Oil Co.,* 419 F.2d 1097 (10th Cir.1968), *cert. denied,* 397 U.S. 1063, 90 S.Ct. 1500, 25 L.Ed.2d 685 (1970). Here is how the Tenth Circuit formulated it:

[T]his court's adjudication that Atomic was entitled to no injunctive relief on appeal on the merits of the permanent injunction ... necessarily determines that the granting of the temporary injunction was improper and served to activate the conditions of both bonds. Such rule is applicable even though the substantive criteria to be applied by a trial court in entertaining a prayer for a pre-

---

**3.** Although Cappaert argues that the bond the Court required was a supersedeas bond under F.R.Civ.P. 62(d), the record suggests that the Court ordered Cappaert to post a bond under F.R.Civ.P. 62(c). The relevant part of subdivision (c) reads:

When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise

as it considers proper for the security of the rights of the adverse party.

**4.** If no security has been furnished, the enjoined party can recover only by showing either that the applicant for injunctive relief filed maliciously and without probable cause or that the applicant has been unjustly enriched as a result of obtaining the relief. See C. Wright and A. Miller, 11 *Federal Practice and Procedure,* § 2973, p. 652, and nn. 38 and 39 (citing cases).

liminary and a permanent injunction are somewhat different.

419 F.2d at 1103. *See also Buddy Systems, Inc. v. Exer-Genie, Inc.,* 545 F.2d 1164 (9th Cir.1976), *cert. denied,* 431 U.S. 903, 97 S.Ct. 1694, 52 L.Ed.2d 387 (1977). On this standard, known as the "automatic damages" standard, if the Court denies the request for a permanent injunction, the previously enjoined party is automatically entitled to damages. C & S has suggested, and the Court originally agreed, that there is also a third standard for applying the rule, the "malicious prosecution" standard. According to this standard, an enjoined party cannot recover damages caused by the wrongful issuance of provisional injunctive relief unless the applicant for such relief prosecuted his suit maliciously and without probable cause. This standard is not relevant here, however. It applies only in cases where the applicant for injunctive relief fails to furnish adequate security. See, e.g., *In Re J.D. Jewell, Inc.,* 571 F.2d 928 (5th Cir.1978).

■ Not surprisingly, C & S urges the Court to adopt the "automatic damages" standard. Not surprisingly, too, Cappaert urges the Court to adopt an extremely narrow "judicial discretion" standard. In fact, the "judicial discretion" standard Cappaert urges the Court to adopt is virtually identical to the "malicious prosecution" standard. Since Cappaert would have the Court award damages only if the Court finds that Cappaert acted in bad faith, Cappaert's standard is a "judicial discretion" standard in name only. After carefully reviewing the arguments of counsel and the applicable law, the Court has decided to reject the recommendations of both parties. The standard to be applied here is the "judicial discretion" standard articulated in *Froehlke.*

5. For a thoughtful discussion of such statements as "A court *ought* to do X" and "A court *ought not* to do X," see J. Simmons, *Moral Principles and Political Obligations* 7–16 (1979).

6. As an example of the inconsistencies between those standards and the ordinary meaning of

As a preliminary matter, the Court notes that neither the "judicial discretion" standard nor the "automatic damages" standard is wholly consistent with the ordinary meaning of the phrase "wrongfully enjoined or restrained" in Rule 65(c). That phrase suggests that a person has been wrongfully enjoined or restrained when he has been enjoined or restrained but ought not to have been. This follows from the fact that to say an act is wrongful is to say that the act ought not to be done.[5] The clear implication of this interpretation is that a court should award damages only when the court has granted injunctive relief but ought not to have done so. According to *Compact Van Equipment Co., Inc. v. Leggett & Platt, Inc.,* 566 F.2d 952 (5th Cir.1978), a court ought not to grant temporary injunctive relief unless the court finds that

> ... the moving party has satisfied four prerequisites for this remedy. These are: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if it is issued, would not be adverse to the public interest.

*Id.* at 954. To say, then, that a person has been wrongfully enjoined or restrained is to say, in ordinary discourse, that a person has been enjoined or restrained where one or more of the four prerequisites enumerated in *Compact Van Equipment* was not satisfied. By contrast, on both the "judicial discretion" standard and the "automatic damages" standard, the issue of whether the prerequisites enumerated in *Compact Van Equipment* have been satisfied is peripheral, if not irrelevant.[6]

Rule 65(c), consider the "automatic damages" standard. On that standard, a decision by the court to deny a request for a permanent injunction automatically means that the court's earlier decision to grant a temporary injunction was wrongful, even though on the facts the court ought to have granted a temporary injunction

■ This Court has found no authority, however, to support the proposition that the phrase "wrongfully enjoined or restrained" ought to be given its ordinary meaning in applying Rule 65(c). Very likely, such authority is lacking for the following two reasons. The first concerns the fact that district courts and appellate courts rely on very different standards in determining wrongfulness. In entertaining a motion for temporary injunctive relief, a district court is obligated to observe the requirements set out in *Compact Van Equipment*. In reviewing the decision on appeal, however, an appellate court cannot consider the matter in the same light. It cannot make a *de novo* determination that the requirements set out in *Compact Van Equipment* have not been satisfied. Instead, the appellate court is obligated to uphold the district court's decision unless the appellate court finds that in issuing the injunction the district court abused its discretion. Ordinarily, such an abuse occurs only when the district court either errs in applying the substantive law or issues the injunction on the basis of factual findings that are clearly erroneous. See *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508 (5th Cir.1969); *Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dep't. Stores, Inc.*, 299 F.2d 33 (2d Cir.1962). See also Wright and Miller, *supra,* note 4, at § 2962, pp. 631–38.

This difference in the standards for determining wrongfulness means both that, if the phrase "wrongfully enjoined or restrained" were given its ordinary meaning, a district court would enjoy enormous power in deciding whether to grant an enjoined party damages and that an appellate court's authority to review the exercise of such power would be very narrowly circumscribed. A district court, for example, would first determine whether the require-

ments for injunctive relief had been satisfied. If it granted the provisional relief but later denied permanent relief and received a request for damages, the district court would then determine if it had abused its own discretion in granting the original relief. In reviewing the award of damages, however, the appellate court would seemingly still be bound by the much more stringent standard adopted in *Wirtz* and *Alexander's Dep't. Stores*. What makes this unsatisfactory is that, while good reasons exist for narrowly circumscribing the authority of an appellate court to review a grant of provisional injunctive relief, no such reasons appear to exist for narrowly circumscribing an appellate court's authority to review an award of damages.

The other important reason why it would be inadvisable to give the phrase "wrongfully enjoined or restrained" its ordinary meaning in applying Rule 65(c) is that a standard based on this interpretation would invariably lead to serious inequities. Imagine an applicant who, unbeknownst to the court, files for temporary injunctive relief maliciously and without probable cause. Imagine, too, that the facts before the court show the applicant is entitled to injunctive relief under *Compact Van Equipment*. In this situation, the court would be obligated to grant the relief but, if security had been furnished, could not later award damages to the enjoined party. Rule 65(c) should not be construed in a way that leads to this kind of inequity. It would be very odd indeed to require courts to observe a rigidly mechanical rule in awarding damages caused by injunctive relief, a rule that might produce inequities, when the primary purpose of giving courts the authority to award damages in the first place is to ensure that an enjoined party will be treated equitably.[7] Thus, given the undesirable

---

under *Compact Van Equipment*. The result in such a case, if Rule 65(c) is given its ordinary meaning, is a contradiction: the court ought to have granted a temporary injunction but, at the same time, ought not to have done so. According to the ordinary meaning of Rule 65(c), an enjoined party is never entitled to damages if the court grants injunctive relief by correctly

applying *Compact Van Equipment* to the facts in the case.

7. See Dobbs, "Should Security Be Required as a Pre-condition to Provisional Injunctive Relief?" (hereinafter cited as "Dobbs"), 52 N.Car. L.Rev. 1091, 1149 (1974) ("The very purpose of the [injunction] bond is to require that the

consequences of interpreting the phrase "wrongfully enjoined or restrained" according to its ordinary meaning, this Court refuses to adopt any standard based on such an interpretation and will look instead to the two standards traditionally applied by the courts.

The Fifth Circuit has commented on the issue raised here in two cases, *H & R Block, Inc. v. McCaslin*, 541 F.2d 1098 (5th Cir. 1976) and *Grant v. Smith*, 574 F.2d 252 (5th Cir.1978). In *McCaslin*, although the court comments favorably on both the "malicious prosecution" standard and the "judicial direction" standard, it is the latter that the court appears to follow. The court begins by noting that the plaintiff, H & R Block, Inc., had filed an injunction bond. The court then states that the trial judge concluded "that Block had sued in good faith, and since there is no liability for damages resulting from a suit for an injunction unless the injunction was obtained maliciously and without probable cause, the judge discharged Block from its liability on the injunction bond. We affirm." 541 F.2d at 1099. This comment suggests the court planned to follow the "malicious prosecution" standard. Two paragraphs later, however, the court declares that "[t]he awarding of damages pursuant to an injunction bond rests in the sound discretion of the court's equity jurisdiction." *Id.* (citations omitted). This is the standard the court appears finally to have adopted, for in upholding the district court's refusal to award the enjoined party damages, the Fifth Circuit considered both the applicant's good faith *and* the equities of the case.

The Fifth Circuit's comments in *Smith* are more ambiguous. The plaintiff in that case claimed that because he was black the defendant had refused to rent or sell him a certain home. The district court issued a temporary restraining order enjoining the defendant from renting or selling the home until the court had an opportunity to consider the matter more carefully. Several months later, after a hearing, the district court dissolved the temporary restraining order and denied the plaintiff a preliminary injunction. The court took this action after finding that the plaintiff's attempts to negotiate with the defendant had the appearance of a sham and were insincere. On appeal, the Fifth Circuit addressed the damage issue by saying, at 256:

> ... If the injunction order is found to have been improperly issued in its inception or wrongfully continued because no discrimination was present, the general rule is that the enjoined party may recover damages, 43 C.J.S. Injunctions § 281b (1945); *Hutchins v. Munn*, 209 U.S. 246, 28 S.Ct. 504, 52 L.Ed. 776 (1908); *Osage Oil & Refining Co. v. Chandler*, 287 F. 848 (2 Cir.1923), if said damages are the actual, natural, and proximate result of the wrong committed.

This statement is ambiguous in that the court offers no explanation of what is meant by the phrases "improperly issued" and "wrongfully continued." The "malicious prosecution" standard would appear to be ruled out, though, since the court never mentions either the plaintiff's good faith or his lack of it in connection with the defendant's right to recover damages. That leaves the "judicial discretion" standard and the "automatic damages" standard. One of the two cases cited in the quoted excerpt, *Osage Oil & Refining Co. v. Chandler*, 287 F. 848 (2d Cir.1923), sheds little light on which of these standards the Fifth Circuit was following. In that case, the Second Circuit simply states that "[t]he general principles for measuring damages

---

plaintiff assume the risk of paying damages he causes as the 'price' he must pay to have the extraordinary privilege of provisional relief"); Note, "The Triggering of Liability on Injunction Bonds," 52 N.Car.L.Rev. 1252, 1256 (1974) ("In order to protect the defendant from harm caused by the recognized need for a speedy determination of interlocutory injunctive relief, the properly fixed bond serves to minimize the drastic effect of this anticipatory relief on the enjoined party."); Note, "Interlocutory Injunctions and the Injunction Bond," (hereinafter cited as "Harvard Note"), 73 Harv.L.Rev. 333, 333 (1959) ("The American cases indicate ... that the purpose of the bond is not merely to protect the court and the defendant from misrepresentation, but to provide indemnity even when the plaintiff is not at fault.")

ordinarily apply for wrongfully suing out injunctions ..." *Id.* at 851. What the court there fails to say is what the phrase "wrongfully suing out injunctions" means. In *Hutchins v. Munn,* 209 U.S. 246, 28 S.Ct. 504, 52 L.Ed. 776 (1909), the other case cited in the quoted excerpt, the Supreme Court was more specific yet seemingly inconsistent. The Court declares, for example, that "[i]t is enough that the [temporary restraining] order was obtained without notice to [Mrs. Munn], that it was wrongfully sued out, that it was observed until dissolved, and that it inflicted injury upon her rights." *Id.* at 249, 28 S.Ct. at 505–506. This suggests a preference for the "automatic damages" standard. At another point in the opinion, however, the court intimates that the leading rule can be found in *Houghton v. Meyer,* 208 U.S. 149, 28 S.Ct. 234, 52 L.Ed. 432 (1907), where the court applied the "judicial discretion" standard. Thus, although the matter is not free from doubt, if *Smith* is interpreted according to what the court there says it is doing, then both *Smith* and *McCaslin* can be construed as suggesting the Fifth Circuit favors the "judicial discretion" standard.

Yet although it may favor the "judicial discretion" standard, the Fifth Circuit has never explained why it favors that standard. Perhaps the most compelling reason for adopting such a standard is that, of the three standards courts might apply, it is the one that is most likely to guarantee equity between the parties, and so is the one that is most consistent with an exercise of the court's equity powers. The "malicious prosecution" standard strongly favors the applicant for provisional injunctive relief. It gives him an incentive to pursue such relief and imposes no penalty on him for doing so unless he acts reprehensibly. It is thus consistent with "the traditional reluctance to penalize a plaintiff for resorting to the judicial process or to make him pay a price for his remedy." Harvard Note, supra n. 7, at 336. Still, this traditional reluctance, which the "malicious prosecution" standard reflects, is itself inconsistent with another, equally important, policy consideration:

> [T]he other is the extreme caution which often permeates judicial proceedings and is reflected in their elaborate safeguards—the apprehension of a rash result or a judgment rendered after inadequate deliberation. Anticipatory relief in the form of an interlocutory judicial directive which stakes the dignity and authority of the court on a decision made without extensive presentation of the facts or opportunity for argument seems inconsistent with this established principle.

*Id.* Another commentator makes much the same point in discussing the security requirement and injunction bonds:

> [O]ne purpose in requiring a security as a condition to provisional relief is the fear that provisional relief, necessarily given after an attenuated hearing or none at all, is especially prone to error. It is one thing to say that, in ordinary trials, the winning party must still pay his own attorney's fees and must even absorb the losses he may have had due to an erroneous trial court decision. But it is entirely something else to say that he must risk such losses without so much as a reasonable opportunity to develop the facts or the legal argumentation in the case. Perhaps one purpose of the injunction bond, then, is simply to recompense the defendant who has been subjected to a process of law that does not meet the kind of standards ordinarily adopted.

*Dobbs,* supra n. 7, at 1094 (citations omitted). Only in unusual circumstances does the "malicious prosecution" standard guarantee a winning enjoined party compensation for being denied the opportunity to develop the facts and his arguments with care and precision. Consequently, the only way to prevent the goal of full and fair deliberations from being subverted in the context of interlocutory proceedings is by rejecting that standard.

The "automatic damages" standard certainly affords an enjoined party sufficient protection, yet it does not always lead to equitable results. Suppose, for example, that an applicant for injunctive relief files in good faith, that he introduces evidence

that suggests the requirements enumerated in *Compact Van Equipment* have been satisfied, and that the court grants him relief. Suppose also, however, that the enjoined party, had he been diligent, could have established that the requirements set out in *Compact Van Equipment* had not actually been satisfied. This is precisely the kind of situation that arose in *Page Communications Engineers, Inc. v. Froehlke,* 475 F.2d at 997. In such a situation although the court would not subvert the goal of ensuring full and fair deliberations by denying the enjoined party damages, the "automatic damages" standard would bar the court from doing just that—from denying damages, so long as the enjoined party prevailed on the merits. The "automatic damages" standard is thus as potentially harmful to an applicant for injunctive relief as the "malicious prosecution" standard is to an enjoined party.

■ In the view of this Court, only the "judicial discretion" standard is sufficiently flexible to guarantee equity between the parties. In balancing equities, however, a court must operate within certain guidelines. In particular, when a bond or security has been furnished, a court must exercise its discretion in such a way as to ensure compensation for an enjoined party that prevails on the merits and that suffers damages caused by the provisional relief, unless good reasons exist for denying compensation. As noted above, one good reason for denying compensation exists when an enjoined party fails to oppose an injunction diligently. *Page Communications Engineers, Inc. v. Froehlke,* 475 F.2d at 987. Another good reason exists, or might exist, when an applicant for injunctive relief fails to prevail on the merits solely because of a change in circumstances unanticipated by either party. Still another good reason exists, or might exist, when injunctive relief not only causes an enjoined party to suffer damages but also allows him to profit in some way. In such a case, the enjoined party would only be entitled to recover damages in excess of profits. This last reason is the one Cappaert offers for why C & S should be denied damages. In Capp-

aert's estimation, the damages C & S suffered as a result of the injunctive relief, if any, do not exceed the profits C & S realized as a result of that relief.

Before turning to Cappaert's arguments on this issue, the Court must first decide what the relevant time frame is for measuring damages and profits. C & S contends that Cappaert's liability for damages began to run on November 6, 1978—the day the Court issued the temporary restraining order and Cappaert furnished security—and that Cappaert's liability extends to all damages C & S has sustained as a result of the temporary restraining order, the preliminary injunction and the injunction pending appeal. Cappaert objects to both contentions. In Cappaert's view, the company's liability only began to run on April 16, 1980—the day the Court approved the bond—and only extends to those damages C & S has sustained as a result of the injunction pending appeal. After reviewing the wording of the bond, the wording of the Order granting the injunction pending appeal, and the applicable law, the Court agrees with C & S.

Here, following, in its entirety, is the surety bond the Court approved on April 16, 1980:

## BOND FOR DAMAGES AND COSTS ON APPEAL

KNOW ALL MEN BY THESE PRESENTS: That we, Cappaert Enterprises, a Mississippi Partnership, as principal, and American Employers' Insurance Company, a corporation organized and existing under the laws of the State of Massachusetts, and duly licensed to transact business in the State of Louisiana, is [sic] held and firmly bound unto Citizens and Southern International Bank of New Orleans, New Orleans, Louisiana, defendant in the above entitled action, in the penal sum of Three Hundred Thousand and No/100 ($300,000.00) Dollars, to be paid to the said defendant, his heirs, executors, administrators, successors and assigns; to which payment, well and tru-

ly to be made, we bind ourselves, our successors and assigns, jointly and severally by these presents.

Sealed with our seals and dated this 11th day of April, 1980. The condition of the above obligation is such that Whereas, the said Cappaert Enterprises, is about to take an appeal to the United States Court of Appeals for the Fifth Circuit, to reverse a judgment rendered and entered on the 3rd day of April, 1980, by the United States District Court for the Eastern District of Louisiana, in the above entitled cause.

NOW THEREFORE, the condition of the above obligation is such that if Cappaert Enterprises shall prosecute its said appeal to effect and answer all damages and costs which may be adjudged against it if it fails to make good its appeal, then this obligation shall be void; otherwise to remain in full force and effect.

This is the bond Cappaert posted to obtain a temporary injunction pending appeal. After the Fifth Circuit dissolved that injunction and affirmed the judgment denying Cappaert a permanent injunction, the parties agreed to reduce the bond from $300,-000.00 to $100,000.00.

■ Although the general rule is that liability on a bond "is limited to the time specified in the bond," See Wright and Miller, *supra* note 4, at 656, the bond approved in this case does not contain any specific time limitations. The bond simply states that, "if Cappaert Enterprises shall prosecute its said appeal to effect and answer all damages and costs which may be adjudged against it if it fails to make good its appeal, then this obligation shall be void; otherwise to remain in full force and effect." The rule of construction that is relevant here was articulated by the Supreme Court in *Meyers v. Block,* 120 U.S. 206, 7 S.Ct. 525, 30 L.Ed. 642 (1886). In that case, the bond the Court considered declared that the applicants for injunctive relief were obligated to "pay . . . [the enjoined party] . . . all damages as he may recover against us in case it should be decided that the said writ of injunction was wrongfully issued." 120

U.S. at 208, 7 S.Ct. at 526. In construing this provision, the Court stated, at 213–14, 7 S.Ct. at 529:

It is undoubtedly true, that a surety cannot be held beyond the terms or legal effect of his engagement; and when that has respect to the conduct or fidelity of the principal, or to any other matter usually contemplated as arising in the future, it is to be interpreted prospectively, and not retrospectively. But if, from the nature of the case, the subject of guaranty is a past transaction in whole or in part, and the language of the engagement, taken in its natural sense or legal effect, is broad enough to cover it, such language may properly be construed to do so.

The relevant language in Cappaert's bond is "Cappaert Enterprises shall . . . answer all damages and costs which may be adjudged against it . . . ." While Cappaert is therefore required to "answer all damages and costs," whereas the applicants in *Meyers* were only required to "pay . . . all damages," this difference in the requirements is inconsequential. Taking the language in Cappaert's bond "in its natural sense or legal effect," the Court here finds that that language is broad enough to cover both the damages C & S sustained while the injunction pending appeal was in effect, as well as the damages C & S sustained while the temporary restraining order and the preliminary injunction were in effect.

Cappaert's bond, however, is not the only relevant document pertaining to this issue. The other document that must be examined is the Order the Court issued on April 3, 1980, granting an injunction pending appeal and specifying the type of bond Cappaert was to post. The provision in the Order that relates to the bond reads as follows:

IT IS FURTHER ORDERED that this injunction is issued against Citizens and Southern International Bank of New Orleans conditioned upon plaintiff's posting of either (a) additional cash in the amount of $250,000.00 with Citizens and Southern International Bank of New Orleans on or before April 15, 1980, which

cash is to be invested in Certificates of Deposit by said bank, with the understanding that the interest accruing thereon will be reinvested in Certificates of Deposit until the total amount of said additional cash deposits equals $300,000.00, and thereafter said interest which accrues shall be paid to plaintiff, or (b) a bond of a good and solvent company on or before April 15, 1980, approved by the Court in the amount of $300,000.00 to protect the interests of defendant during the term of said injunction as set forth herein.

On its face, this provision is ambiguous. Although the last three lines state that the purpose of the provision is "to protect the interests of defendant [C & S] during the term of said injunction as set forth herein," nothing else in the Order reveals which of C & S' interests the Court intended for the bond to protect. The phrase "interests of defendant" can be interpreted either narrowly or broadly. If interpreted narrowly, the phrase refers solely to the interests C & S has in recovering for damages the bank sustained during the term of the injunction pending appeal. If interpreted broadly, the phrase refers both to those interests and to the interests C & S has in recovering for damages the bank sustained during the respective terms of the temporary restraining order and the preliminary injunction. To resolve this ambiguity, the Court cannot simply turn to the language in the bond. Indeed, the law requires just the opposite: it requires the Court to interpret the bond in light of the Order, not vice-versa. *Meyers v. Block,* 120 U.S. at 213, 7 S.Ct. at 528–529.

Since this Court knows of no reasons, though, why the rule of construction adopted in *Meyers* for the interpretation of bonds should not also be adopted for the interpretation of orders issued in conjunction with bonds, that rule is adopted here. Under that rule, the Court can only conclude that Judge Gordon intended for his order of April 3, 1980, to be interpreted in favor of C & S. Four facts lead the Court to this conclusion. First, when Judge Gordon issued both the temporary restraining order

and the preliminary injunction, one of his aims was to ensure that C & S was adequately secured. Second, when he issued the injunction pending appeal, Judge Gordon was again concerned about guaranteeing C & S adequate security. Third, if the bond he ordered Cappaert to post had not applied to all three injunction periods, Judge Gordon would have stripped C & S of the very protection he previously had sought to guarantee it. Finally, when viewed "in its natural sense or legal effect," the relevant language in the order—"interests of defendant [C & S]"—can readily be construed as referring to C & S' interests in recovering for damages sustained during all three injunction periods. Given these four facts, the Court finds that the bond applies to all recoverable damages C & S sustained from November 6, 1978—the day the temporary restraining order was issued—until October 14, 1981—the day the Fifth Circuit denied Cappaert's appeal.

This conclusion is supported by the ruling in *Monroe Division, Litton Business Systems, Inc. v. DeBari,* 562 F.2d 30 (10th Cir.1977). The plaintiff in *DeBari,* like Cappaert, was not required to post a bond to obtain preliminary injunctive relief; the defendant already had sufficient security without a bond. When the trial court subsequently refused to issue a permanent injunction but denied a motion to assess damages for wrongful issuance of the preliminary injunction, the defendant appealed. The plaintiff's opposition on appeal was simple and straightforward: since no injunction bond had been posted, the defendant could recover only by proving malicious prosecution. To this the court responded:

> In *Continental Oil Co. v. Fontier Refining Co.,* 10th Cir., 338 F.2d 780, 782–783, we held that the security requirement of Rule 65 gave the judge a discretion to dispense with a security bond when the applicant for the injunction had "considerable assets" and was "able to respond in damages".... implicit in our decision in *Atomic Oil [Co. of Oklahoma, Inc. v. Bardahl Oil Co.,* 419 F.2d 1097 (10th Cir.1969), cert. denied, 397 U.S.

1063, 90 S.Ct. 1500, 25 L.Ed.2d 685 (1970) ] is recognition that Rule 65 mandates security for the protection of the person enjoined. 419 F.2d at 1101. That protection is not eliminated when the court relies on the financial strength of the parties seeking the injunction in place of the security of a bond. To hold otherwise would make a farce of the rule and of our *Continental Oil* decision.

*Id.* at 32. Since this Court has no desire to make a farce of Judge Gordon's ruling that Cappaert need not have posted a bond to obtain either a temporary restraining order or a preliminary injunction, and since restricting liability on the bond solely to damages sustained during the appeal period would do just that, the Court finds that the bond applies from the day the temporary restraining order was granted to the day the appeal was denied.

█ Having settled this issue, the Court is now in a position to determine the extent of C & S' damages. The general rule is that damages are recoverable only if they "arise from the operation of the injunction itself and not from damages occasioned ... independently of the injunction." *Lever Brothers Company v. Intern. Chemical Wkrs. Union,* 554 F.2d 115, 120 (4th Cir.1976). In applying this rule, the Court will start at the bottom of C & S' list, with the $15.00 amendment fee. Since no evidence was introduced at the evidentiary hearing to explain this fee or to show it was caused by the issuance of the injunctive relief, the Court must find that in this suit the fee is not a recoverable item of damages.

█ The next item on the list is the telex charges of $415.00. (See C & S–12). Of these charges, however, only the last seven, totalling $100.00, can be attributed to or were caused by the Court's grant of injunctive relief. The remaining charges were all made prior to the issuance of the temporary restraining order and bear no relation to it. Consequently, since only $100.00 of the telex charges "arises from the operation of the injunction," C & S in this suit is entitled to that amount alone.

█ The same logic applies to the paying commission of $679.67. This commission is not an item of damages caused by any of the three injunctions. If Cappaert is obligated to pay the commission, its obligation to do so does not arise under the case law interpreting Rule 65(c), Rule 62(c), or Rule 65.1 of the Federal Rules; the obligation arises, instead, under article 5 of the letter of credit established in favor of the Bank of Kuwait and the Middle East. C & S itself concedes as much when it says "article 5 of the letter of credit obligates Cappaert to pay C & S 'on demand, *with respect to the credit,* a commission at such rate as [C & S] may determine to be proper, and any and all charges and expenses which may be paid or incurred by [C & S] in connection with the credit, together with interest where chargeable.'" (See C & S memorandum of July 27, 1983, p. 13) (emphasis added). By C & S' own admission, then, Cappaert would be obligated to pay the commission even if the Court had never issued the injunctions. From this it follows that the paying commission cannot reasonably be said to "arise from the operation of the injunction." Whether C & S in a separate suit to enforce its rights under article 5 of the letter of credit is entitled to recover the paying commission, as well as the additional telex charges and the amendment fee, is not an issue now before the Court.

█ Turning to C & S' claim for its expert witness fee of $16,236.25, the Court finds that this item of damages is also not recoverable. C & S acknowledges that expert witness fees are not recoverable under federal law, *see, e.g., International Ladies' Garment Workers' Union v. Donnelly Garment Co.,* 147 F.2d 246, 254 (8th Cir.1945); *Powelton Civic Home Owners Association v. Department of Housing and Urban Development,* 284 F.Supp. 809, 840 (E.D.Pa.1968), but contends that Louisiana law is controlling on this issue and that such fees are recoverable under that law. This Court need not determine which law applies, however, for even under Louisiana law C & S is not entitled to recovery. Louisiana law permits recovery only if an expert is "quali-

fied by the trial court as [an] expert[ ]." *Wallace v. State Farm Fire & Casualty Insurance Co.,* 345 So.2d 1004, 1009 (La. App.2d Cir.1977). *See also Hebert v. Diamond M Company,* 385 So.2d 410 (La.App. 1st Cir.1980). Here C & S' expert, Mr. W.M. Ballantyne, was never called to testify in any proceeding before the Court and so was never "qualified" by the Court as an expert. Even assuming, then, that state law applies, C & S' request must be denied.

■ The next item on the list is the claim for an opening fee of $22,428.95. According to the testimony given at the evidentiary hearing by Ms. Ann Wager, a vice-president of C & S, this fee represents a discretionary charge for maintaining on the bank's books from April 25, 1980, through December 15, 1981, the $679,000.00 liability stemming from the letter of credit established in favor of the Bank of Kuwait and the Middle East. (See also C & S–6). C & S has produced no argument or authority, however, to show either that the bank had a legal obligation to carry the $679,000.00 as a liability or that the bank suffered any harm by choosing to carry the amount in that way. Equally noteworthy is the fact that, during the relevant period, C & S held assets from Cappaert in excess of the liability, assets consisting of a $500,000.00 certificate of deposit and a $300,000.00 surety bond. What these facts reveal is that this particular liability was a liability only because C & S chose to label it as such. In short, C & S has not convinced the Court that the opening fee is needed to compensate the bank "for [an] injury actually sustained." *Lee v. Southern Home Sites Corporation,* 429 F.2d 290, 293 (5th Cir.1970). Under these circumstances, the fee cannot reasonably be classified as an item of damages. C & S' request for the fee must therefore be denied.

■ As to the last item on the list, C & S' claim for $33,244.20 in legal fees, this too must be rejected. C & S acknowledges that legal fees ordinarily are not recoverable as an item of damages for wrongful injunction. See *Fireman's Fund Insurance Co. v. U.S.E.K. Construction Co.,* 436 F.2d 1345 (10th Cir.1971). As C & S points out, however, there is an exception to the general rule, which is this: legal fees are recoverable "where specifically authorized by statute or by contract." *Washington Aluminum Co. v. Pittman Construction Co.,* 383 F.2d 798, 805 (5th Cir.1967). In C & S' view, although no statute is applicable here, two articles in the "Application and Agreement for Commercial Letter of Credit" ("Agreement"), drafted by C & S, provide the requisite authorization. Those articles read as follows:

> In consideration of your [C&S] issuing the Credit . . . the undersigned [Cappaert] hereby (jointly and severally) agree(s) as follows:
>
> 5. To pay you on demand, with respect to the Credit, a commission at such rate as you may determine to be proper, and any and all charges and expenses which may be paid or incurred by you in connection with the Credit, together with interest where chargeable.
>
> 16. Should any of the aforesaid obligations and/or liabilities of the undersigned not be paid or discharged when they become due and payable as herein provided, or should it become necessary to employ an attorney to enforce the same or recover the same or any portion of same, or should this instrument be placed in the hands of an attorney for collection, or compromise or for any other reason, the undersigned agrees to pay the fees of such attorney, which are hereby fixed at 20% on the amount then due with legal interest and all costs, which attorney's fees are secured by the pledge hereunder.

(See C & S – 4). Cappaert contends that neither of these articles authorizes the Court to award C & S attorney's fees. The Court agrees.

The Court's duty, in deciding this particular issue, is to construe all of the clauses in the Agreement "in reference and relation to each other giving to each that meaning which results from the entire contract," *Royal St. Louis, Inc. v. U.S.,* 578 F.2d 1017, 1018 (5th Cir.1978), and to construe "any ambiguities in the [Agreement] . . . against

the drafter," C & S. *Shell Oil Co. v. S.S. Orient Coral,* 548 F.Supp. 1385, 1388 (E.D. La.1982). With these rules of construction in mind, the Court first finds that, when the Agreement is read in its entirety, article 5 is most plausibly construed as referring solely to the *internal commissions,* charges and expenses incurred by C & S in handling the Bank of Kuwait letter of credit; that is, to such items as the administrative expenses incurred in handling the letter and to the commissions charged for issuing the letter. Nowhere in article 5 is there an explicit reference to attorney's fees. C & S argues that, construed broadly, the meaning of the words "charges" and "expenses" includes attorney's fees. Even so, this is not sufficient to entitle C & S to recover such fees. For those very same words can also be construed more narrowly as excluding attorney's fees, especially since the word "fees" can be found in article 16 but not in article 5. Since both of these constructions are reasonable, the words "charges" and "expenses" must be deemed ambiguous. Given this, the Court must construe article 5 in favor of Cappaert and find that the article provides no basis for the recovery of attorney's fees.

With respect to article 16, the Court's finding is essentially the same. Although that article does explicitly refer to attorney's fees, it provides no basis for their recovery in this case. The rate of attorney's fees in article 16 is "fixed at 20% on the amount then due ..." Obviously, then, the critical question is this: What does the phrase "amount then due" mean? According to C & S, the phrase refers to the amount owed by C & S to the Bank of Kuwait under the letter of credit. C & S contends that on November 3, 1978, $100,-000.00 became due to the Bank of Kuwait and that in subsequent quarters the remaining $579,000.00 also became due. Thus, in C & S' view, the bank is entitled under article 16 to 20% of $679,000.00, although the bank is only requesting attorney's fees for the amount actually billed by counsel.

C & S' argument is fatally flawed for two reasons. First, no more than $100,000.00 ever became due under the Bank of Kuwait letter of credit. That is the amount that became due on November 3, 1978, three days before the Court issued the temporary restraining order. Once the restraining order had been issued, no other amount could become due. The explanation for this is relatively simple: an amount could become due only if C & S had an obligation to pay and the injunctions expressly provided that C & S had an obligation not to pay. At most, then, only $100,000.00 ever became due. Hence, the most C & S could recover is 20% of that amount. What's more, if C & S is really only requesting attorney's fees for the amount actually billed by counsel, then the most the bank could recover is the amount actually billed for work done on this matter between November 3, 1978 and November 6, 1978.

Yet C & S is not even entitled to that amount because of the second fatal flaw in its argument. As noted above, C & S contends that the phrase "amount then due" refers to the amount owed by C & S to the Bank of Kuwait under the letter of credit. Article 16, however, does not say that, at least it does not say that unequivocally. As the Court reads the article, the phrase "amount then due" refers, not to the amount owed by C & S to the Bank of Kuwait under the letter of credit, but rather to the amount owed by Cappaert to C & S under the Agreement. The first clause in the article states: "Should any of the aforesaid obligations and/or liabilities of the undersigned not be paid or discharged when they become due ...." This is the clause that clarifies the meaning of the phrase "amount then due." This clause speaks, moreover, of the "aforesaid obligations and/or liabilities of the undersigned [i.e., of Cappaert]" becoming due. The clause says nothing about any obligations and/or liabilities of C & S becoming due. On this reading, C & S would have a right to recover attorney's fees only if at some point Cappaert's obligation to pay C & S under the Agreement had become due. If that obligation never became due, there could be no "amount then due" to which the attorney's fees could be "fixed at 20%." After

carefully reviewing the record, the Court concludes that Cappaert's obligation to pay C & S never became due. For that obligation to be triggered, at least two conditions had to exist: C & S' obligation to pay the Bank of Kuwait must have become due and C & S must have submitted a demand for payment to Cappaert.[8] The argument above shows that none of C & S' obligations to pay the Bank of Kuwait became due during the injunction periods. This being so, none of Cappaert's obligations to pay C & S were triggered during that period, either. Thus, no attorney's fees are owed on the $579,000.00 in quarterly payments that would have become due had no injunctions been issued. For a different reason, the same is true with respect to the $100,000.00 that became due on November 3, 1978. The amount that became due on that day became due for C & S. On that day, C & S had an obligation to pay the Bank of Kuwait. Cappaert's obligations to pay C & S under the Agreement, however, did not become due until C & S submitted a demand for payment. Nothing in the record shows that such a demand was ever made. Consequently, no amount ever became due for Cappaert. There was thus never any "amount then due" to which attorney's fees could be "fixed at 20%" or at any other figure. For these reasons, C & S' request for attorney's fees must be denied.

The only remaining issue before the Court is whether the damages C & S sustained because of the three injunctions exceeded the profits C & S realized because of these injunctions. After carefully analyzing C & S' claim, which amounts to $73,019.07, the Court has concluded that the bank's damages totalled only $100.00. By the bank's own admission, "C & S earned some $680.00 more because of the TRO and injunctions than it would have absent their issuance." (C & S, Post-Hearing Memorandum, p. 4). Thus, as a result of the three injunctions, C & S' profits exceeded its damages by $580.00. Given this, the Court must reject C & S' claim for recovery in its entirety.

8. The relevant articles in the Agreement read as follows:

1. To pay you on demand, at your Head Office, and in United States currency, the amount of each draft (whether SIGHT or TIME) which may be drawn in UNITED STATES CURRENCY under the Credit, or purport to be so drawn; also, in any event and without demand, to effect such payment with respect to each such TIME draft sufficiently in advance of its maturity date to enable you to arrange (in the usual course of the mails) for cover to reach the place where such time draft is payable not later than ONE (1) business day prior to its maturity, it being understood that you will notify the undersigned of the amount and date of maturity of each such time draft.

2. To pay you on demand, at your Head Office and in United States currency, the equivalent (at your then selling rate for cable transfers to the place where and in the currency in which such draft is payable) of the amount of each draft (whether SIGHT or TIME) which may be drawn IN OTHER THAN UNITED STATES CURRENCY under the Credit, or purport to be so drawn; also, in any event and without demand, to effect such payment with respect to each such TIME draft sufficiently in advance of its maturity date to enable you to arrange (in the usual course of the mails) for cover to reach the place where such time draft is payable not later than ONE (1) business day prior to its maturity, or, at your option, to provide you then with the amount of currency in which such time draft is payable in such form and manner as shall be acceptable to you, it being understood that (i) you will notify the undersigned of the amount and date of maturity of each such time draft; and (ii) the undersigned will comply with any and all governmental exchange regulations now or hereafter applicable to any foreign exchange provided you pursuant to this paragraph, and will indemnify and hold you harmless from any failure so to comply.

3. In event of any U.S. Currency draft(s) being drawn by the undersigned on you whereby to refinance any obligation(s) set forth in "1" and "2" hereof and such draft(s) being accepted by you (at your option), the undersigned will pay you on demand, but in any event not later than ONE (1) business day prior to its maturity the amount of each such acceptance. It is understood that each amount which may become due and payable to you under this agreement may, in your discretion and if not otherwise paid, be charged by you to any available funds then held by you for the account of the undersigned.

(See C & S – 4).

For the reasons discussed above, the Court hereby DENIES C & S' motion to assess damages and GRANTS Cappaert's motion to dissolve the bond.